## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

SOUTHERN RAILWAY COMPANY AND WALKER D. HINES,
DIRECTOR-GENERAL OF RAILROADS V. WHITE,
*and*
SOUTHERN RAILWAY COMPANY AND WALKER D. HINES,
DIRECTOR-GENERAL OF RAILROADS V. BOWDEN.

November 18, 1920.

1. WATERS AND WATERCOURSES—*Flooding Lands—Duty of Railroad
   Company.*—Where a railroad company substitutes a culvert
   for a trestle on its roadbed, it is its duty to exercise due care
   not to obstruct the natural flow of the water at seasons of
   either low or high water; that is to say, it is the duty of the
   company to provide security against ordinary periodical
   freshets, which could be foreseen with reasonable certainty.

2. WATERS AND WATERCOURSES—*Flooding Lands—Duty of Railroad
   Company—Case at Bar.*—In the instant case a railroad com-
   pany substituted a culvert for a trestle upon its roadbed where
   the roadbed crossed a small stream. There was positive evi-
   dence that before the construction of the culvert the stream
   often overflowed its banks, but there was no backwater. It
   was the contention of the company that it used due care in
   the construction of the culvert, and had so constructed it as
   not to obstruct such flows of flood waters as might be reason-
   ably expected to occur; and that its engineers closely fol-
   lowed the formula for a culvert sufficient for the drainage of
   the area drained by the stream.

   *Held:* That plaintiffs contentions with respect to the extent of
   the backwater on their respective farms, and the damage done,
   and that this backwater was due to the inadequacy of the cul-
   vert and did not take place under the prior conditions, were
   fully sustained by the evidence.

3. WATERS AND WATERCOURSES — *Flooding Lands — Unprecedented
   Flood—Act of God—Case at Bar.*—In an action for flooding
   lands, defendant contended that the rainfall at the time of
   the overflow was of an unprecedented character, and could
   not have been anticipated in the exercise of ordinary fore-

sight and prudence; in other words, that it was an act of God, against which defendant railroad company was under no obligation to undertake to provide.

*Held:* That the evidence on this point clearly showed that the rain in question was not an unprecedented downpour, but one that from the experience of that locality could reasonably have been expected, and hence was such a rain as the defendant company was compelled to provide against when it undertook to replace a trestle with a culvert.

4. WATERS AND WATERCOURSES—*Flooding Lands—Continuing Nuisance—Action for Future as Well as Present Damages—Case at Bar.*—In the instant case, an action for the flooding of plaintiffs' lands due to an insufficient culvert, on defendant railroad's bed, the inadequacy of the culvert to carry off the high waters of a periodical character likely to occur was established. It was further shown that the inadequacy of the culvert rendered it a perpetual menace to plaintiffs' properties, and that this menace had materially reduced their market value.

*Held:* That the moment that it was established that the culvert was a perpetual menace to the properties concerned, an immediate cause of action arose, and the injury not depending upon the use of the culvert, the landowners were under no obligation to bring successive actions for successively recurring damages, but might recover in one action for past and future damages.

5. MULTIPLICITY OF SUITS—*Policy of the Law.*—The general policy of the law is to avoid multiplicity of actions, and, if practicable, without injustice, to afford compensation in one action for all damages.

6. NUISANCES—*Continuing Nuisance—One or Several Actions for Damages.*—The general rule with respect to nuisances undoubtedly is that repeated actions may be brought as long as the nuisance continues, but an exception to the general rule, as well established as the rule itself, is that where a nuisance is permanent, the consequences of which, in the normal course of things, will continue indefinitely, there is but a single action therefor, and the entire damage suffered, both past and future, must be recovered in that action, and the right to recover will be barred unless it is brought within the prescribed number of years from the time the cause of action accrued.

EXPERT AND OPINION EVIDENCE—*Admissibility of Opinion Evidence.*—In an action against a railroad company for damages to plaintiff's lands due to an insufficient culvert causing the

periodical flooding of the lands, while the extent of the injurious effect of the culvert upon the value of plaintiffs' lands is a matter of opinion, still such opinion evidence is not inadmissible. There is much testimony given in court that really, in the ultimate, is merely human judgment or opinion. Absolute certainty is rarely attainable in court proceedings, or conclusions therein reached with the precision and severity of a mathematical demonstration. The law very sensibly allows all the relevant facts and circumstances to be placed before the jury that will aid them to make an intelligent disposition of the issue submitted.

Error to a judgment of the Circuit Court of Albemarle county in an action of trespass on the case. Judgment for plaintiffs. Defendants assign error.

*Affirmed.*

The opinion states the case.

*W. Allan Perkins* and *Geo. E. Walker,* for the plaintiffs in error.

*G. M. McNutt,* for the defendants in error.

SAUNDERS, J., delivered the opinion of the court.

These are two cases that by agreement of parties were heard and determined together, the same jury rendering a verdict in each case. The plaintiffs (defendants in error in this court) severally sued the Southern Railway Company for damages caused them by the backed up flood waters of the Hardware river. The backing up of these waters was alleged to be due to the inadequacy of a culvert of the defendant company, constructed across the said water course. The damages complained of occurred in August, 1917, following a very heavy rain on the watershed of the Hardware, which submerged a portion of the lands of the

70

plaintiffs and seriously damaged the almost matured crops of corn on the submerged area.

The plaintiffs severally brought action in the Circuit Court of Albemarle county, claiming damages for injury done to the growing crops, and "damage and depreciation in value" of their respective farms.

The defendant company moved the court to make Walker D. Hines, Director-General of Railroads, a co-defendant with the Southern Railway Company in the two causes. The plaintiffs offering no objection, this was accordingly done, and as stated, *supra,* by agreement, the causes were ordered to be tried together. Thereupon, after the disposition of certain preliminary questions, a jury was duly sworn, and having heard the evidence and arguments of counsel, and being instructed as to the law by the court, returned a verdict in favor of C. B. White for $400, in full of "his damage past and future," and one for Ella Bowden for "her damage past and future," in the sum of $3,000. The defendants moved the court to set aside these verdicts on various grounds. These motions were overruled. Thereupon the defendants applied for and secured from one of the judges of this court writs of error and supersedeas in the said cases.

The pertinent facts necessary to be stated for the proper understanding and disposition of the errors assigned are as follows: The Hardware river is a small stream in Albemarle county flowing across the line of the Southern Railway Company. At the point of intersection the river, in a general way, is flowing from the west to the east. The general course of the railway line is north and south. The Hardware river is composed of two streams which unite a short distance west of the line of the railway. These two larger streams have numerous small affluents, and drain an area estimated by the railway company, upon the basis of the maps prepared by the United States Government, to contain approximately 12,000 acres.

· The plaintiffs, taking the lands known to be in this drainage area, and using the acreage figures furnished by the land books of the county, reach the conclusion that the approximate content of this area is 15,000 acres.

The northern branch of the Hardware river flows through the lands of Mrs. Ella Bowden, and is spoken of as North Hardware creek. The southern branch, described in the declarations as Cross Roads creek, flows through the lands of C. B. White. The Hardware river, as stated, *supra*, is formed by the junction of the above streams. Formerly the railroad crossed the Hardware river on a wide, high trestle, or bridge. The petition of the plaintiffs in error describes this trestle as follows: "The span of this trestle from back wall to back wall was 105 feet; the distance between the masonry to the two abutments was ninety-three feet."

In the year 1915, the Southern Railway Company undertook the construction of a double track road through Albemarle county. At the point where the road crossed the Hardware river, it was decided to build an arch, or culvert, over that stream. This culvert is described by the engineer for the road as a "three-centered arch, practically egg shaped," and is stated to be "admittedly the best for carrying flowing streams." The dimensions of the culvert are, width thirty feet, and height twenty-five and one-half feet in the clear. On each side of the culvert are solid fills, or embankments of earth, the effect of which is to constrain the waters of the Hardware at all times to pass through the culvert. The opening under the trestle which preceded the culvert was a very wide one, so that in time of freshets, if the Hardware river overflowed its banks, the rising waters spread out to the left and right and flowed off without interruption. The very positive testimony of the witnesses is that before the construction of the culvert the Hardware often overflowed its banks to the west of the railroad, but that there was no backwater.

[1] It was the duty of the railway company, when it substituted the culvert and accompanying structures for the trestle which preceded them, to exercise due care not to obstruct the natural flow of the river at seasons either of low or high water; that is to say, it was the duty of the company to provide security against ordinary periodical freshets, which could be foreseen with reasonable certainty.

The principle in this connection is stated in *American Locomotive Co.* v. *Hoffman,* 105 Va. 349, 54 S. E. 27, 6 L. R. A. (N. S.) 252, 8 Ann. Cas. 773: "As a general rule, the upper riparian owner has, as against the lower riparian owner, the right to have the water course flow from his land according to nature, and a lower tenant has no right to pen back or obstruct the flow of the water so as to flood the lands of the upper owners, or by raising the level of the water in the channel interfere with the drainage of the upper land, or to subtract from the water power of the upper owner. Where bridges, culverts, etc., are constructed across water courses by railroad companies, municipalities, or other corporations, or by individuals, due care must be taken not to obstruct the natural flow, including that at seasons of either low or usual high water, and the failure to do so will render the offender liable for injuries to land owners caused by the penning back of the waters and the overflow of their lands. But such structures need not be constructed in such a manner as to permit the unobstructed flow of the water course in times of unprecedented and extraordinary freshets."

The contention of the company is that it did use due care "to construct the culvert, and had so constructed it as not to obstruct such flows of flood waters as might reasonably be expected to occasionally occur in the Hardware river; and that the company was not liable for the damage done by the flood in August, 1917, because that damage was occasioned by a great and sudden visitation of water, whose

occurrence could not be anticipated, and whose devastating force could not be guarded against by the exercise of ordinary care and skill."

Speaking of the culvert and its adequacy, Mr. Abernathy, engineer for the company, says that "the question of figuring an opening to carry a given drainage is a technical question, not a guess. It is an engineering question." Further with reference to the proper size of the culvert over the Hardware river, he says: "Assuming that the area which the Government map showed was correct—12,000 acres—and we checked these maps in hundreds of places, and applying the formula as recognized by engineering authorities, and at the same time assuming the worst possible drainage conditions, with maximum rainfall, it will figure out that the area necessary to carry this stream—I have the figures in my pocket—the area necessary is 440 square feet."

The actual area of the culvert through which water can pass unobstructed is 509 square feet, or fifteen per cent. in excess of the requirement, and more than sufficient according to the witness (Abernathy) for a drainage of 15,000 acres, which according to the formula used requires an opening containing 488 square feet. This witness, however, declined to state that the new culvert carried off the water as adequately as the opening under the old bridge or trestle.

"Q. Mr. Abernathy, do I understand from your evidence that you tell the jury that the new culvert carries off the water as adequately as the old bridge did?

"A. I didn't make that statement.

"Q. I would like you to make a statement on that point?

"A. I think I made it very clear to Mr. Gordon, in discussing that question, that after the water reaches a certain elevation under the old conditions, the area was increased, and under the new conditions the area is decreased.

"Juror: In other words, the old construction, the more water it had the more passway; and under the new construction the more water, the less passway.

"A. In area of square feet that is true."

Again this witness says: "As the water rises now, the passage gets smaller, and before as the water rose, the passage got larger."

The contention of the company and the statements of its witnesses present squarely the issue of the adequacy or sufficiency of the culvert to carry off the waters of the Hardware under such rains as could be reasonably anticipated in that neighborhood. However closely and accurately the engineers of the company may have followed formula in the construction of the culvert over the Hardware river, the fact remains that in August, 1917, this culvert did not carry off as formerly the flood waters of the river, but that these waters were backed upon the lands of the complainants, doing great damage to the growing crops.

In this connection the plaintiff, White, who lives on Cross Roads creek, the southern branch of the Hardware, says: "Well the creek didn't hardly get out of the banks, and the water backed in on me there. We didn't have very much rain, any more than usual. When I went down there at the lower end of my bottom, you couldn't see a stalk of corn hardly at all; just now and then a tassel, and it was backing up over nearly half of my bottom land, over top of the corn."

Mr. Bowden, a witness for the plaintiff, Ella Bowden, makes the following statement of the extent of the submergence on Mrs. Bowden's land: "I will say this to the jury, that I had thirty acres of land on these bottoms, and in the land that comes down from the highlands, and as much as thirty acres of that land had water standing on it; as much as twenty acres was in a flooded condition; as much as thirteen acres of that land I attribute to the extraordinary flood of water that came back from the culvert."

"Q. How is that?

"A. As much as twenty acres was damaged by water; as much as thirteen acres was standing up on it was overflowed by water that was backed up."

[2, 3] The contention of the plaintiffs, (1) with respect to the extent of the backwater on their respective farms, and the damage done, (2) that this backwater was due to the inadequacy of the culvert and did not take place under the prior conditions, are fully sustained by the evidence. The plaintiffs in error contend that the rain of August, 1917, was of an unprecedented character, and could not have been anticipated in the exercise of ordinary foresight and prudence; in other words, that it was an act of God against which the railway company was under no obligation to undertake to provide. This contention raises an issue of fact. The evidence on this point is altogether the evidence of the plaintiffs and their witnesses, and very clearly shows that the rain in question was not an unprecedented downpour, but one that from the experience of that locality could reasonably be expected. The rain does not appear to have been uniform over the watershed affected. At some points it was heavier than at others, but neither on the north Hardware, where it was heaviest, nor on Cross Roads creek, was it of an unprecedented character.

C. B. White has this to say of the rainfall on Cross Roads creek:

"Q. That was a tremendous flood in August, 1917?

"A. No, sir, not on my land. My creek did not get out of the banks." Again—

"Q. Wasn't the water higher than (August, 1917) on the north Hardware river than it has been since 1870?

"A. No, it wasn't. That culvert wouldn't let it pass, but it wasn't higher down below than I have seen it before."

Smith Mawyer, a witness for White, testifies as follows:

"Q. How long have you lived in that neighborhood Mr. Mawyer?

"A. All my life.

"Q. What would you say as to the rain that occurred on that day (August, 1917), as to the size of it?

"A. Well, I have seen the creek coming down from my house or down to Charlie White's (the plaintiff), I have seen it much higher than it was that day.

"Q. Would you call that rain an extraordinary flood?

"A. No more than I have seen, not as much as I have seen on that part where I have lived.

"Q. Mr. Mawyer, was that such a rain as might reasonably be expected to occur at certain seasons of the year?

"A. I don't see why. I have seen the water higher on that stream than I did then."

Other witnesses testify to the same effect, some of them more strongly, as to the rainfall in August, 1917, on Cross Roads creek.

Lewis Johnson, an old man of sixty, states that there is a tree east of the culvert over the Hardware river, and that at different times he and others had made marks upon that tree showing the height of unusual flood waters in the river. There were six of these marks. Comparing the mark for 1917 with the antecedent marks, this witness says that the "water was nothing like as high as it had been."

Mr. Samuel M. Page, a witness for the plaintiffs, speaking of the rain on the north Hardware creek, the one on which Bowden lives, says: "I have lived in that neighborhood forty years. There is no question but what the rain (August, 1917) was a very severe rain. I live on the north branch of the Hardware. It was unquestionably a very hard rain. I have seen the water higher on my place than it was at that time several times in the last four years.

It was unquestionably a hard rain, but I have seen harder and higher water at my place."

"Q. Mr. Page, was that such a freshet as might reasonably be expected to occur at certain seasons of the year?

"A. I have seen a great many overflows in the last four years, harder rains. This was probably one of the hardest rains. We seldom have as hard rain as that, but I have seen harder, some three times in the last forty years. I have seen harder rains and higher water at my place."

[4] These citations from the evidence (and many others might be made to a like effect) establish beyond controversy that the rain of August, 1917, was a very heavy rain, but not an unprecedented one. It was such a rain as from the experience of that community was reasonably to be expected. Hence, it was such a rain as the company was compelled to provide against when it undertook to replace the old trestle conditions with a single culvert. It is clear from the evidence that the culvert provided was inadequate, and that the injury to the growing crops of the plaintiffs for which they sought recovery was due exclusively to this inadequacy. There was no error in the instructions of the court, or the finding of the jury with respect to this feature of the case. But the verdict included as an additional element of recovery permanent damage to the value of the plaintiffs' lands, and the plaintiffs in error contend that this damage could not be recovered in these actions, but that successive actions should be brought for successively recurring damages—that "a cause of action could arise only in time of unusual freshets and floods." In this connection the petition of the plaintiffs in error says: "The evidence shows that the plaintiffs suffered no damages whatever until August, 1917, though the culvert had been completed one year prior to that time—and then only damage to their crops, and plaintiffs have suffered no damage to land or crops since. Therefore, it cannot be said that the erection of the

71

culvert caused the damage, and that it has been continuous from the time of its completion. If any damage is sustained, it would only be at intervals, and a new injury will be inflicted with each operation. Permanent injuries to land are those which might and which necessarily result from the operation or use of a permanent plan, or structure, and continue as long as the operation goes on. Such damages are readily apparent, reasonably certain, and therefore ascertainable in one action. But injury which cannot be anticipated and which results from happenings which may or may not take place, are not of a permanent character, contemplated for recovery in a single action. Such damages in the outset are only speculative and conjectural, and the injuries upon which they are based, if such result, constitute a new cause of action whenever they occur."

The plaintiffs do not contend that the productive qualities of their lands, so far, have been diminished. They agree that unless the flooding operations are repeated too often and last too long, the backing of the waters of the Hardware river on their lands will deposit silt that in all likelihood will enhance their fertility. But the plaintiffs do contend and sustain that contention by ample and uncontradicted testimony, (1) that the flood of 1917 established the inadequacy of the culvert in question to carry off the high waters of a periodical character reasonably likely to occur on the watershed of the Hardware river, (2) that the inadequacy of the culvert under these conditions renders the same a perpetual menace to their properties, and (3) that this menace has materially reduced their market value of the same.

If in advance of the experience of 1917 the plaintiffs had brought actions for damages to the market value of their lands arising from the construction of the culvert, they would have been confronted with the defense that the damages claimed were speculative and conjectural. They would

have been involved in a maze of exclusively expert testimony; by which the railway company, resting upon approved formulae, would have sought to confirm, and doubtless from a technical standpoint would have confirmed, the statement of the engineer, Abernathy, appearing in the instant case, to the effect that "Judging from the table which we used in figuring the required area of the drainage under the worst possible conditions, he did not think it reasonable to expect the water to back up under ordinary conditions," and that the formulae used "are expected to give a sufficient opening to take care of the adjacent property." But the rain of 1917 has taken the situation out of the domain of speculation or conjecture. The results following upon that downpour have established the fact, formulae or confident scientific expectation to the contrary, that under conditions likely to occur in any year in that community, the culvert opening provided by the railway company is not sufficient to take care of the adjacent property. It is an established menace to be reckoned with, not a protection to that property. Any prospective buyer of the lands subject to backwater must take into consideration the uncertainty of harvesting the annual crops for which those lands are best suited. In view of that uncertainty the witnesses agree that the market value of the lands now shown to be subject to backwater has been materially diminished by the culvert of the defendant company.

The issues (1) of the inadequacy of the culvert, (2) of the diminution of market value of the lands of the plaintiffs due to that inadequacy, and (3) of the extent of that diminution, were submitted to the jury, and verdicts, as stated, *supra*, were rendered in favor of the plaintiffs, both for the growing crops and the reduction in the value of the lands affected.

The plaintiffs in error seek to bring their defense against the claim for damages for reduction in the market value

of the overflowed lands within the principle announced in the case of *N. & W. Ry. Co.* v. *Allen,* 118 Va. 428, 87 S. E. 558, and other cases. In the *Allen Case* the railway installed a pumping station for the purpose of supplying a tank on its right of way for locomotive purposes. The plaintiff brought suit, alleging that he had been damaged by reason of the fact that the defendant company had been pumping and had diverted the waters in Lockett's creek from their usual course to such an extent as to seriously interfere with the operation of plaintiff's mill. The company contended that the tank and pumping station constituted a permanent structure, and therefore a single suit to recover damages resulting from the use of same should have been brought within five years from their installation. This question of limitation does not arise in the case in judgment, but the question of law is presented, whether upon the facts the plaintiffs may recover "once for all." In the case cited last, *supra,* the court says: "It is well settled that when a permanent structure is unlawful in and of itself, irrespective of any damages which flow from it, a cause of action accrues at once upon the erection of the unlawful structure, and the plaintiff may recover once for all, but when a structure is lawful, as when it is erected on the defendant's own premises, and is not *per se* injurious to the plaintiff, then the plaintiff's cause of action arises, not from the erection of the structure, but only for such injury as may result from the use of the structure. In other words, a thing which is lawful is not actionable until the plaintiff has suffered injury on account of it. A single suit under the facts of this case could not be made to embrace future damages for the reason that it cannot be assumed that the defendant will continue to illegally inflict injury upon the plaintiff. To indulge such a presumption might result in awarding damages to the plaintiff for an injury never suffered by him." 118 Va. p. 432, 87 S. E. 559.

On a rehearing of this case the court said: "The erection
of these structures (the tank and pump) by the defendant
upon its own premises, was lawful and harmless, however
permanent in its character, and afforded the plaintiff no
cause of action whatever. Diverting the water by the
operation of the pump was the cause of the plaintiff's in-
jury, and the defendant's own evidence shows that the
operation was not continuous but only at intervals thereby
inflicting a new injury with each operation."

Mr. Freeman, in a note to the case of *St. Louis, etc.* v.
*Biggs,* 20 Am. St. Rep. 174, 176, says: "The authorities
agree that when the original act creating a nuisance to land
is permanent in its nature, and is at once productive of all
the damage which can ever result from it, and at once de-
stroys the estate for all practicable purposes, so that when
the act is completed all the damage that can be effected
thereby is consummated, the entire damages must be re-
covered in one action, and the statute of limitations begins
to run against the cause of action from the time of the com-
plete erection of the nuisance."

"What constitutes a permanent nuisance within the mean-
ing of the rule above given is thus defined in a leading case:
'Wherever the nuisance is of such a character that its con-
tinuance is necessarily an injury, and where it is of a per-
manent character that will continue without change from
any cause but human labor, there the damage is an original
damage, and may be at once fully compensated, since the
injured person has no means to compel the individual doing
the wrong to apply the labor necessary to remove the cause
of injury, and can only cause it to be done by the expendi-
ture of his own means." *Troy* v. *Cheshire Ry. Co.,* 23 N.
H. 83, 55 Am. Dec. 177.

The culvert in question was a structure on the defendant's
property. Under the test of actual trial, it was proven to
be an occasion of injury, a perpetual menace, under the

weather conditions of that community, to the properties affected. The moment that it was established that this structure of the defendant company was in itself a perpetual menace to the properties concerned, it effected thereby a permanent diminution in value of those properties, and created an immediate cause of action. The injury inflicted did not depend upon the use of the property. In the *Allen Case, supra,* the pumping station, in itself and under natural conditions, was not efficient to cause injury to the plaintiff. The damage was not occasioned by the establishment of the station complained of, but by the use of the pumps. That use reduced the volume of water in the stream to the serious prejudice of the plaintiff's corn and flour mill. The court very properly concluded that it could not presume that the company would continue to "illegally inflict injury upon the plaintiff," and "that the plaintiff must sue for injuries resulting from the actual operations of the plant— that is to say, a separate suit could be brought for the injuries resulting from each illegally inflicted injury."

But in the case in judgment, the culvert, under the prevailing and established weather conditions, is a permanent menace. The use by the company of the tracks forming the superstructure of the culvert in no wise affects the situation. It neither increases nor diminishes the menace of the structure itself. The culvert which is the cause of injury is a permanent structure, and "will continue in due course without change from any cause but human labor." The injured parties have "no means to compel the defendant company which has inflicted the wrong to apply the labor necessary to remove the cause of injury."

[5] For the reasons given, entire damages were properly recoverable in the instant case in one action. The general policy of the law is to avoid multiplicity of actions, and, if practicable, without injustice, to afford compensation in one action for all damages.

This case easily falls within the principles announced in the cases of *Norfolk County Co.* v. *Etheridge,* 120 Va. 379, 91 S. E. 133; *Southern Ry. Co.* v. *McMenamin,* 113 Va. 121, 73 S. E. 980; *Va. Hot Springs Co.* v. *McCray,* 106 Va. 461, 56 S. E. 216, 10 L. R. A. (N. S.) 465, 10 Ann. Cas. 179, and *Worley* v. *Mathieson, Alkali Works,* 119 Va. 862, 89 S. E. 880. To the same effect is Wood on Nuisances (3d ed.), Vol. 11, sec. 869, citing many authorities. This author says: "Where the damages are of a permanent character and go to the entire value of the estate affected by the nuisance, a recovery may be had of the entire damages in one action—and so too when the nuisance is of such a character that its continuance is necessarily an injury, and it is of a permanent character so that it will continue without change from any cause but human labor, it is held that the damage is original and may be at once fully compensated."

In the case of *Southern Railway Co.* v. *McMenamin,* 113 Va. 121, 131, 73 S. E. 980, 983, the court says: "The general rule with respect to nuisances undoubtedly is that repeated actions may be brought as long as the nuisance continues, but an exception to the general rule, as well established as the rule itself, is that where a nuisance is permanent, the consequences of which in the normal course of things, will continue indefinitely, there is but a single action therefor, and the entire damage suffered, both past and future, must be recovered in that action, and the right to recover will be barred unless it is brought within the prescribed number of years from the time the cause of action accrued."

To the same effect is the *Etheridge Case,* 120 Va. 379, 381, 91 S. E. 133, 134, in which it appears that an "enormous dam and reservoir was built across a natural water course known as 'Gum Swamp.' The lake of water thus impounded covers some four hundred and fifty acres of land belonging to the defendant, the entire structure being

on its premises. This structure caused the Gum Swamp to be filled with water to such an extent that the natural drainage to the plaintiff's land was interfered with, and the water from the artificial lake or reservoir backed upon the plaintiff's farm, thereby causing the injuries complained of." 120 Va. p. 381, 91 S. E. 134.

The court, in this case, said in part: "There can be no question that this is a permanent structure, and that the evidence warrants the conclusion, that the injuries to the land flowing from it are not of a recurrent or intermittent character, but are permanent in their nature, and in the normal course of things will continue indefinitely. It is true that the water sometimes gets low in dry weather, and the overflow ceases temporarily, but the *menace of an over-, flow and destruction of crops* is always present, as shown by the repeated damage to crops." (Italics supplied.) 120 Va. p. 381, 91 S. E. 134.

On page 382 of this case (91 S. E. 134) the court states the measure of damages in these cases: "In conclusion, we are of opinion that under the law and the facts of this case, the permanent damage to the land of the plaintiff, both past and future, must be recovered in this action, the measure of such damage being the difference in the market value of the land with and without the dam, to be computed as of the time immediately before the dam was built and immediately after it was finished and filled with water."

The case of *Worley* v. *Mathieson Alkali Works*, 119 Va. 862, 89 S. E. 880, is another case in which the damage alleged to have been sustained by the plaintiff resulted from a cause permanent in its character. This was a case of continuing stream pollution. The court held that this was "plainly a case of permanent nuisance, the consequences of which, in the normal course of things, would continue indefinitely." Hence, the plaintiff was limited to a single action for the entire damage, past and future.

It may be argued that there is a substantial difference of fact between the cases in which waters are continuously polluted, or lands are perpetually overflowed by backwater from a dam, and a case like the one in judgment in which the overflows are recurrent and of short duration. The same principle of liability is appropriate to all cases where the nuisance is permanent and a constant and continuous agency of injury. Under the test of actual trial, the inadequacy of the culvert in the instant case was established. It is the proven efficient cause of overflows upon the lands affected. Under the weather conditions on the watershed of the Hardware river, these overflows due to defendants' culvert will occur with certainty though at uncertain intervals. The liability to overflow for which defendant is responsible has introduced a new element of uncertainty, an added risk in the cultivation of the lands in question. This uncertainty of return, the chances that the crop pitched will not be harvested, are shown to have affected the market value of the plaintiffs' lands. The offending cause is the defendants' culvert. It is an established permanent nuisance, the consequences of which in the normal course of things will continue indefinitely.

The trial court was plainly right in holding that all damages could be collected in one action, and in directing the jury, in response to an inquiry from one of its members as to whether a verdict in the case for permanent damage to land would cover damage to land and crops in future, that such a verdict would cover such damages, and no other suit for damages could be brought by either of the plaintiffs, their heirs, assigns, or successors.

[7] There is one assignment of error that may be disposed of in this connection, and that is the exception to the action of the trial court refusing to sustain a motion of the defendants to the effect that "all evidence of witnesses as to the market value of the land be excluded, because the

72

witnesses have testified that the lands have not been injured at all, and there was no washing; that so far as the fertility of the soil was concerned, it was as good since the freshet as before, and further that the jury be instructed to disregard all evidence as to the market value of the land before and since the culvert was put in, and that the jury be directed to disregard estimated damages, and that if the jury should reach a conclusion that the railroad company was liable, in assessing damages that it could not take into consideration any damage so far as permanent injury to the land was concerned."

In view of what we have already said, the trial court was plainly right in overruling this motion. It is true that the extent of the injurious effect of the culvert upon the value of the plaintiffs' lands was a matter of opinion; but there is much testimony given in court that really, in the ultimate, is merely human judgment, or opinion. Absolute certainty is rarely attainable in court proceedings, or conclusions therein reached with the precision and severity of a mathematical demonstration. The law very sensibly allows all the relevant facts and circumstances to be placed before the jury that will aid them to make an intelligent disposition of the issue submitted. This court has cited with approval in *Southern Ry. Co. v. McMenamin, supra*, 113 Va. p. 129, 73 S. E. 982, the following extract from a text-book of recognized authority: "Absolute certainty in such cases is not attainable and is not required. The injured party cannot be denied the right to recover because he cannot show the exact amount with certainty, though he is ready to show to the satisfaction of the jury that he has suffered large damage. Where, from the nature of the case, the amount of damage cannot be ascertained with certainty, there is no objection to placing before the jury all the facts and circumstances of the case having any tendency to show damages or their probable amount, so as to enable them

to make the most intelligible and probable estimate which the nature of the case will admit." 1 Sedgwick on Damages, sec. 170.

This case was submitted to the jury on the merits, under instructions that were appropriate to the facts. There was no error in the instruction that the jury could ascertain and include the entire damage in one verdict, nor in any of the other instructions given by the court. These instructions very accurately and compactly state the law. Nor was there any error in refusing the instructions of the defendant,

In the view that we have taken of the case, the defendant company, upon the facts and pursuant to established principles, was clearly liable for the damages to the growing crops of the plaintiffs inflicted in the year 1917, and for the diminution in the market value of their lands. These issues were submitted to the jury with accompanying instructions that adequately and correctly afforded the appropriate law.

The judgment of the Circuit Court of Albemarle county is affirmed.

*Affirmed.*