PRESENT: Lemons, C.J., Goodwyn, Mims, McClanahan, Kelsey, and McCullough, JJ., and Koontz, S.J.

FOREST LAKES COMMUNITY
ASSOCIATION, INC., ET AL.

v. Record No. 151779

OPINION BY
JUSTICE D. ARTHUR KELSEY
February 16, 2017

UNITED LAND CORPORATION
OF AMERICA, ET AL.

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Paul M. Peatross, Judge Designate

In the circuit court, two property owners' associations ("POAs") sued various owners and developers of parcels in the Hollymead Town Center ("HTC"), a shopping center, claiming that HTC's sediment basins discharged sediment into a creek that flowed into a lake owned by the POAs. The POAs sought damages and injunctive relief. Holding that the incursion of sediment had been occurring for more than five years prior to the suit being filed, the circuit court sustained pleas in bar brought by the HTC defendants asserting the five-year statute of limitations. We affirm.

I.

"If the parties present evidence on [a] plea ore tenus, the circuit court's factual findings are accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support." *Hawthorne v. VanMarter*, 279 Va. 566, 577, 692 S.E.2d 226, 233 (2010); *see also Pike v. Hagaman*, 292 Va. 209, 214, 787 S.E.2d 89, 92 (2016). Thus, under the "governing standard of review" applicable to judges sitting as factfinders no less than jurors, "we review factfinding with the highest degree of appellate deference." *Vasquez v. Commonwealth*, 291 Va. 232, 248, 781 S.E.2d 920, 929 (2016) (citation omitted). We thus review the evidence in the light most favorable to the prevailing parties and accept as true any

reasonable inferences that could be drawn from the evidence before the factfinder. *See*

*Commonwealth ex rel. Fair Hous. Bd. v. Windsor Plaza Condo. Ass'n*, 289 Va. 34, 59, 768

S.E.2d 79, 91 (2014).

A.

Created in the 1960s, the Hollymead residential subdivision lies just east of Route 29 in

Albemarle County. The subdivision developer originally dug a sediment basin to support the

construction effort. The basin accumulated sediment from the residential construction site as

well as from Powell Creek, which flowed through the watershed west of Route 29 and

underneath it through a culvert to the sediment basin. The developer ultimately turned the

sediment basin into a lake, known as Lake Hollymead, and encircled it with residential lots.

In 2003, commercial developers started construction of HTC on property situated west of

Route 29 in the watershed area that included Powell Creek, the waterway that flowed into Lake

Hollymead. The County's planning staff recommended, and the County Board approved, the

HTC development plan that authorized the construction of three sediment basins. All three were

permanently in place by fall 2004. The sediment basins complied with local and state

regulations, which require the sediment basins to retain a maximum of 60% of sediment flowing

into them and allow approximately 40% of sediment to discharge into surrounding waterways.[1]

---

[1] Albemarle County Code § 17-203(B) (2001) (current Albemarle County Code
§§ 17-402(C), -500) (requiring erosion and sediment control plans to comply with the Virginia
Erosion and Sediment Control Handbook and relevant state administrative regulations); 4 VAC
§ 50-30-40 (2004) (current 9 VAC § 25-840-40) (specifying minimum criteria, techniques, and
methods to be followed in an erosion and sediment control plan); Va. Dep't of Envtl. Quality,
Virginia Erosion and Sediment Control Handbook § 3.14, at 78 (3d ed. 1992) (noting that
sediment basins constructed per the handbook's specifications "are, at best, 60% effective in
trapping sediment"). The section in the county code and the relevant state administrative
regulation were authorized by former Code § 10.1-563 (2004) (current Code § 62.1-44.15:55).

Forest Lakes Community Association, Inc., and Hollymead Citizens Association, Inc., (collectively, the "POAs") are property owners' associations that jointly own Lake Hollymead. Shortly after the HTC development began in 2003, the POAs and their members complained that excessive sedimentation was flowing from the denuded areas of the new HTC site, into Powell Creek, through a culvert, and ultimately into Lake Hollymead. The County considered, but ultimately rejected, suggestions for more robust sediment and erosion controls on the HTC site including, for example, water-filtration and purification systems to reduce sediment entering Powell Creek.

In late 2004 and early 2005, members of the POAs discussed the need to take legal action. The POAs, however, waited until 2011 to file their suit seeking damages and injunctive relief against the developers, contractors, and owners of the HTC site (the "HTC defendants").[2] At the time of filing, eight years had passed from the start of the HTC project, and seven years had passed since the construction of the three HTC sediment basins. The POAs' amended complaint alleged that sediment from the HTC site began to enter Lake Hollymead as soon as the topography of the HTC site was denuded and destabilized in 2003 and 2004. "After such land clearance, the resultant runoff of sediments and silt entered Powell Creek, and thence flowed into

---

[2] The First Amended Complaint alleges that: (i) United Land Corporation of America was a contractor and developer of a portion of HTC and was responsible for erosion and sediment control efforts during construction of that portion of HTC; (ii) C.W. Hurt Contractors, LLC (now known as CEVA Contractors) was a contractor and developer of a portion of HTC and was responsible for erosion and sediment control efforts during construction of that portion of HTC; and (iii) Route 29 LLC; NYC Land Trust; One-Ninth Land Trust; HM Acquisition Group, LLC; Sixty Four 616 Land Trust; S-V Associates, LLC; 1641 Edlich Drive Realty LLC; Post Office Land Trust; The Daniel Group, Inc.; Hollymead Area C Owners Association, Inc.; Pequa LLC; TIKI, LLC; Anthony D. and Mary Kathryn Valente; Rosewood Village of Hollymead, LLC; Hollymead Corner, LLC; HTC Hotel LLC; and Bob Evans Farms, Inc.; are present or former owners of various parcels within HTC that contributed to the alleged silt and sediment discharges. *See generally* J.A. at 31-39.

Lake Hollymead." J.A. at 59. "[A]s early as 2005," the POAs alleged, "sediment pollution, including visible soil banks, were already starting to form in Powell Creek and at the headwaters of Lake Hollymead." *Id.* at 63. "The runoff and subsequent deposits of silt, sediments and pollution continue to this day, in varying amounts depending upon site conditions, weather and the effectiveness of erosion controls at the site, with each new release of silt and sediments constituting a new and independent trespass to the [POAs'] properties," the POAs alleged. *Id.* at 59. "Such sediment releases and discharges are continuing." *Id.* at 60.

The POAs asserted two common-law rights of action, trespass and nuisance. They sought an award of compensatory and punitive damages along with an injunction abating the ongoing sediment incursion into Lake Hollymead. The HTC defendants responded with demurrers and pleas in bar. Each of the pleas in bar asserted that the POAs' trespass and nuisance claims accrued as early as 2003 and no later than 2005 and thus were barred by Code § 8.01-243(B), which provides that "[e]very action for injury to property . . . shall be brought within five years after the cause of action accrues."

### B.

The circuit court conducted an ore tenus hearing on the pleas in bar.[3] After hearing evidence for a full day, the court stated that it would take the matter under advisement and issue a ruling after receiving briefs from the parties. Approximately seven months after the hearing, however, counsel learned that the case had been referred to another judge. Shortly thereafter, a recusal order informed counsel that the second judge assigned to the case had recused herself

---

[3] "A plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery. The party asserting a plea in bar bears the burden of proof on the issue presented." *Hawthorne*, 279 Va. at 577, 692 S.E.2d at 233 (citations omitted). None of the parties requested that a jury be empaneled pursuant to Code § 8.01-336(B).

4

from the case, and a subsequent order reflected that it would be reassigned to yet another judge. A retired judge sitting by designation then presided over "a new evidentiary hearing" and required that the exhibits presented at the earlier hearing be "moved into evidence" in the new hearing, J.A. at 414,[4] which suggested that the court was limiting itself to the record developed at the new hearing.

At the new evidentiary hearing, the parties offered witnesses and exhibits seeking to identify the timing, manner, quantum, and consistency of sediment discharge into Hollymead Lake allegedly caused by the HTC sediment basins. The HTC defendants asserted that the major sediment flow occurred during the construction process from 2003 to 2004. The discharge flow continued, they argued, on a regular basis thereafter. By fall 2004, each of the three sediment basins were permanently in place. *Id.* at 533-35, 550-51, 554-55. The County engineer responsible for administering the water-protection ordinance testified that "there's always some silt and sediment that flows through the basin." *Id.* at 514; *see also id.* at 524.

The County engineer, testifying as an expert on erosion and sediment control and watershed protection on behalf of the HTC defendants, also stated that multiple other sites west of Route 29 (including a mobile home park, an airport construction site, a post office, and a church) were connected to the same watershed and "continue to contribute to the sediment load" that ultimately made its way into Lake Hollymead. *Id.* at 503-04. Even so, the expert opined, all of the discharge "was in keeping with the County's regulations as well as the Virginia erosion and sediment control regulations," *id.* at 499, and in "full compliance" with the regulators' expectations of the efficacy of the sediment basins, *id.* at 507. These "sediment basins" were "working as they are designed to perform." *Id.* at 525-26. Under these facts, the HTC

---

[4] The POAs' counsel agreed. J.A. at 491 ("This is a new evidentiary hearing.").

defendants contended that the cause of action for property damage first accrued no later than 2004, resulting in an expired statute of limitations in 2009.

The POAs sought to present a slightly different factual scenario with significantly different legal consequences. They acknowledged the early incursion of sediment into Lake Hollymead during the construction time-frame, but they claimed that separate and distinct sediment incursions occurred later, each triggering the accrual of new causes of action that began anew the five-year statute of limitations. This thesis, however, was not supported by any detailed evidentiary showing. The POAs' counsel took the position that it was unnecessary "to separate out how much silt came from who and when and where" because that "has nothing to do with a Plea in Bar on the statute of limitations against these defendants." *Id.* at 486.

The POAs' expert witness, moreover, appeared to concede the difficulty of measuring distinct, free-standing episodes of sediment flows when asked, "isn't it true that there is always silt and sediment flowing through the Hollymead Town Center sediment basin, through Powell Creek into Lake Hollymead?" *Id.* at 703. The expert answered: "Sure. There's always sediment in every body of water." *Id.* He later characterized the continuous sediment flow as "insignificant," *id.*, but he never testified that there was ever any period of time in which the sediment flow was not continuous.

In his motion to strike and closing arguments, the POAs' counsel admitted that "from the beginning, there's no dispute by anybody that in 2005 and earlier Lake Hollymead received a lot of sediment. It was muddy, discolored. Sediment was coming from HTC. That's all been agreed." *Id.* at 723-24. Various storm events, he nonetheless argued, created an "intermittent continuous sequence." *Id.* at 599. Counsel asked rhetorically, "How much erosion will run off from the bare soil at HTC and actually make it to the basin?" *Id.* at 727. "Those are all things

6

we don't know. But what they do attribute to is a highly variable mix of discharges from these basins." *Id.* The POAs' counsel added that any "continuous discharge" of sediment into Lake Hollymead was not a "significant contribution" to the total amount of sediment deposited in the Lake. *Id.* at 598.

In the alternative, the POAs' counsel argued that the sediment discharges, even if continuous, constituted a "continuing trespass," and thus, "the statute of limitations does not run because it's a continuing trespass." *Id.* at 603-04; *see also id.* at 725, 734. "So those sediments, whatever amount they are, they are in Lake Hollymead, and they are still there. They came from HTC, at least in part, and until they are removed, it is a continuing trespass." *Id.* at 605; *see also id.* at 734. No statute of limitations ever runs, counsel contended, until after the HTC defendants dredge their sediment out of Lake Hollymead. *Id.* at 604, 607.[5]

Sitting as factfinder, the court ruled against the POAs on the first issue, whether discharge was continuous or intermittent. "I really studied closely and listened carefully to the Plea in Bar on the continuing flow versus intermittent flow," the judge stated, "and I find that the defendants have sustained their burden, and I'm going to sustain the Plea in Bar." *Id.* at 739. As for the POAs' alternative continuing-trespass argument, the court held as a matter of law: "I'm going to sustain the Plea in Bar in terms of there's no continuing trespass with no statute of limitations. I do not accept that." *Id.* Upon these grounds, the circuit court entered final judgment dismissing the POAs' case.

---

[5] On appeal and below in the circuit court, the POAs make alternative arguments for the operation of the statute of limitations: (1) The statute of limitations does not begin until the deposits physically stop entering Lake Hollymead, *see* Appellants' Br. at 24; (2) The statute of limitations is continuous until the HTC defendants remove all sediment from the lake, *see* Appellants' Br. at 18; J.A. at 591, 734; and (3) The statute of limitations "never" runs if the trespass continues, J.A. at 604, 607.

II.

A. ASSIGNMENTS OF ERROR

On appeal, the POAs frame their disagreement with the circuit court's decision in two very specific ways. The first assignment of error states that the court erred in "holding that all trespass damages" from the sediment discharges into Lake Hollymead and "all claims for further damages" from later discharges were barred by the five-year statute of limitations. Appellants' Br. at 7. The second assignment of error faults the court for "refusing to rule" on the POAs' motion for summary judgment on the grounds that the continuing-trespass theory had not been adopted yet in Virginia and "thus would not be considered by the trial court." *Id.*

We highlight the specific wording of the assignments of error to emphasize the importance they play in our appellate review. An assignment of error is not a mere procedural hurdle an appellant must clear in order to proceed with the merits of an appeal. Assignments of error are the *core* of the appeal. With the assignment of error, an appellant should "lay his finger" on the alleged misjudgment of the court below. Martin P. Burks, Common Law and Statutory Pleading and Practice § 425, at 827 (T. Munford Boyd ed., 4th ed. 1952). A properly aimed assignment of error must "point out" the targeted error and not simply take "a shot into the flock" of issues that cluster around the litigation. *Plant Lipford, Inc. v. E.W. Gates & Son Co.*, 141 Va. 325, 332, 127 S.E. 183, 185 (1925) (citations omitted). "An assignment of errors is in the nature of a pleading, and in the court of last resort it performs the same office as a declaration or complaint in a court of original jurisdiction." *Puckett v. Commonwealth*, 134 Va. 574, 579, 113 S.E. 853, 854 (1922) (citation omitted).[6] Like a well-crafted pleading, assignments of error

---

[6] *See Nicholas v. Harnsberger*, 180 Va. 203, 208, 22 S.E.2d 23, 25 (1942); *Ennis v. Town of Herndon*, 168 Va. 539, 545, 191 S.E. 685, 687 (1937); *Ballard v. Commonwealth*, 156 Va.

8

set analytical boundaries for the arguments on appeal, provide a contextual backdrop for our ultimate ruling, and demark the stare decisis border between holdings and dicta.

B.  THE STATUTE OF LIMITATIONS & TRESPASS DAMAGES

The POAs' first assignment of error asserts that the circuit court erred by applying the five-year statute of limitations in Code § 8.01-243(B) to bar their claim for trespass damages. The assignment of error makes no mention of the injunctive relief they sought in their amended complaint or the equitable doctrine of laches.  We thus limit our analysis to the question of whether Code § 8.01-243(B) barred the POAs' claim for trespass damages.

1.

"Every action for injury to property . . . shall be brought within five years after the cause of action accrues."  Code § 8.01-243(B).  The POAs' trespass claim asserts an injury to property, and thus, the only question is when these claims accrued for purposes of running the five-year limitation period.  The general principle, well recognized in Virginia law, deems the accrual of a cause of action for "injury to property," *id.*, to take place when the first measurable damage occurs.  *See* Code § 8.01-230 (providing that "the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of . . . damage to property"); *Southern Ry. v. Leake*, 140 Va. 438, 441, 125 S.E. 314, 315 (1924) ("Whenever any injury, however slight it may be, is complete . . . , the cause of action then accrues."); *Virginia Hot Springs Co. v. McCray*, 106 Va. 461, 470-71, 56 S.E. 216, 220 (1907)

---

980, 1005-06, 159 S.E. 222, 231 (1931); *Daily v. Rucker*, 151 Va. 72, 80, 144 S.E. 466, 468 (1928); *Thurston v. Woodward*, 139 Va. 315, 316, 123 S.E. 366, 366 (1924). *See generally* Burks, *supra*, § 425, at 827; Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 17.8[K], at 1359 (6th ed. 2014).

(finding that that the statute of limitations begins to run once the property has been damaged).[7] At that point, the limitation period begins to run. Subsequent, compounding or aggravating damage — if attributable to the original instrumentality or human agency — does not restart a new limitation period for each increment of additional damage. *See* Kent Sinclair, Sinclair on Virginia Remedies § 65-4[C], at 65-21 (5th ed. 2016).

That conclusion remains true even if the damage is expected to continue beyond the end of any remedial litigation. In such cases, the claimant should forecast and claim a damage award for past, present, *and* future damages. *Id.* (noting that, when the consequent damages "in the normal course of things will continue indefinitely, there can be but a single action therefor and the entire damage suffered, both past and future, must be recovered in the action" (emphasis omitted)); *see also Southern Ry. v. White*, 128 Va. 551, 567-68, 104 S.E. 865, 870-71 (1920).[8]

An important caveat, however, accompanies this general principle. It is possible for a new cause of action to accrue that looks remarkably like an earlier one but is nonetheless a stand-alone claim in its own right. When this occurs, the damage accompanying the new cause of action sets new accrual starting blocks for a separate limitation period. *See generally* 1 James H. Backman et al., A Practical Guide to Disputes Between Adjoining Landowners — Easements

---

[7] The rule is the same in other areas of tort law. "[I]f *any* injury or damage immediately results from the wrongful or negligent act of another, the party aggrieved has a cause of action, and the statute of limitations begins to run at that time." *Stone v. Ethan Allen, Inc.*, 232 Va. 365, 369, 350 S.E.2d 629, 632 (1986) (emphasis in original). "[W]here an injury, though slight, is sustained in consequence of the wrongful or negligent act of another and the law affords a remedy therefor the statute of limitations attaches at once." *Id.* (emphasis omitted) (quoting *Richmond Redev. & Hous. Auth. v. Laburnum Constr. Corp.*, 195 Va. 827, 839, 80 S.E.2d 574, 581 (1954)). "It is not material that *all* the damages resulting from the act should have been sustained at that time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date." *Id.* (emphasis in original).

[8] *See generally* Charles T. McCormick, Handbook on the Law of Damages § 127, at 500-15 (1935); 1 Theodore Sedgwick, A Treatise on the Measure of Damages §§ 94-95, at 159-63 (9th ed. 1912) (citing, inter alia, *Virginia Hot Springs Co.*, 106 Va. at 470-71, 56 S.E. at 220).

§ 9.04[3][a], at 9-64 to -67 (2016) (discussing "temporary or recurring nuisances"). In this situation, Code § 8.01-243(B) relies upon the traditional definition of "cause of action" to police the distinction between an existing cause of action with continuing damages and a series of separate causes of action, each with its own set of damages.

2.

Though easy to restate, these concepts defy any attempts at formulaic applications. Because the underlying issue — determining the boundaries of a cause of action — depends so heavily on the factual context of each case, our jurisprudence has tailored these principles to analogous fact patterns and rights of action. In the most analogous case to the present one, an upstream property owner built a sewer system for a newly reconstructed resort that discharged into the stream, and a downstream property owner sought an award of "damages for polluting and befouling" the stream that ran through the claimant's property. *Virginia Hot Springs Co.*, 106 Va. at 462, 56 S.E. at 217.

In response to the claimant's assertion that the discharge was "an actual physical invasion" of his property, the upstream property owner claimed that the "sewer system was in its nature, design and use a permanent structure," which discharged to some degree continuously into the stream. *Id.* at 466, 56 S.E. at 218. For this reason, the upstream defendant argued that the downstream claimant's cause of action should be barred by the five-year statute of limitations, which ran from the date the permanent sewer system began discharging into the stream. The trial court rejected this argument, but we reversed.[9]

---

[9] In *Virginia Hot Springs Co.*, the downstream claimant asserted a nuisance claim. *See* 106 Va. at 463, 56 S.E. at 217. As the POAs and the HTC defendants correctly assume in their briefs, our reasoning in that case applies both to nuisance and trespass claims. *See Hampton Rds. Sanitation Dist. v. McDonnell*, 234 Va. 235, 239-40, 360 S.E.2d 841, 843-44 (1987) (applying

11

Recognizing the nuances this scenario presented, we surveyed in some detail the "great weight of authority" represented by more than a dozen cases from other states as well as leading treatises addressing the subject. *Id.* at 471, 56 S.E. at 220. We adopted the prevailing view that a cause of action involving an injury of a "permanent character, resulting from a permanent structure" accrued when the injury was *first* sustained, *id.* at 470-71, 56 S.E. at 220, even though "the injury constantly and regularly recurs" over time, *id.* at 467, 56 S.E. at 219 (quoting *Rosenthal v. Taylor, Bastrop & Houston Ry.*, 15 S.W. 268, 269 (Tex. 1891)).[10] "So far as human foresight could determine the sewer structure would continue as constructed for all time." *Richmond Fairfield Ry. v. Llewellyn*, 156 Va. 258, 286, 157 S.E. 809, 818 (1931) (describing the facts of *Virginia Hot Springs Co.*). This accrual principle applies when the "damages resulted from the erection of permanent structures, the use of which produced the injury complained of immediately after the structures were first operated, the consequences of which continued in the normal course of such operations, and might have been expected to continue indefinitely." *G.L. Webster Co. v. Steelman*, 172 Va. 342, 363, 1 S.E.2d 305, 314 (1939).

---

the statute-of-limitations analysis for nuisance cases to a trespass claim). *See generally Haywood v. Massie*, 188 Va. 176, 182, 49 S.E.2d 281, 284 (1948) ("Generally speaking, there is a distinction between a nuisance and a trespass, although many things are sometimes called nuisances which are mere trespasses, and it has been said that an action for a nuisance which violates a property right incident to the ownership of land is in the nature of one for trespass to realty." (citation omitted)). Though the analyses in these cases differ in some details, they remain substantially the same for statute-of-limitations purposes. *See, e.g.*, *Hampton Rds. Sanitation Dist.*, 234 Va. at 239, 360 S.E.2d at 843-44 (citing *Norfolk & W. Ry. v. Allen*, 118 Va. 428, 435, 87 S.E. 558, 560 (1916), a nuisance case, for the general accrual principles to be applied to the plaintiff's trespass cause of action for discharges of sewage on plaintiff's land).

[10] *See also* McCormick, *supra* note 8, § 127, at 500-15; Raymond D. Hiley, Comment, *Involuntary Sale Damages in Permanent Nuisance Cases: A Bigger Bang From* Boomer, 14 B.C. Envtl. Aff. L. Rev. 61, 68 (1986) ("If the structure that injuriously affecting the plaintiff's property was permanent, and the continuance of the injurious effect was relatively certain, then the injury to the property was considered permanent, or 'original.'" (quoting *Virginia Hot Springs Co.*, 106 Va. at 464, 56 S.E. at 218)).

Put another way, when the recurring injuries "in the normal course of things, will continue indefinitely, there can be but a single action therefor, and the entire damage suffered, both past and future, must be recovered in that action," and as a result, "the right to recover will be barred unless it is brought within the prescribed number of years from the time the cause of action accrued." *Norfolk Cty. Water Co. v. Etheridge*, 120 Va. 379, 380-81, 91 S.E. 133, 134 (1917) (quoting *Worley v. Mathieson Alkali Works*, 119 Va. 862, 865-66, 89 S.E. 880, 881 (1916)). For more than a century, this principle has been "the firmly established rule of law in this jurisdiction." *Magruder v. Virginia-Carolina Chem. Co.*, 120 Va. 352, 354, 91 S.E. 121, 122 (1917).[11] In this scenario, the limitation period runs from the start of the continuous and indefinite injury not the end of it. *See generally Harrisonville v. W. S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 341 n.6 (1933) (explaining "that the cause of action is single and arises at the time of the first injury, and that the statute of limitations runs from that date" (citing, inter alia,

---

[11] *See also Southern Ry. v. Watts*, 134 Va. 503, 511, 114 S.E. 736, 738 (1922) (recognizing that the principle applies in "most cases of permanent works" when the "completion of the work and the commencement of the damage are practically simultaneous"); *Southern Ry. v. Fitzpatrick*, 129 Va. 246, 253-54, 105 S.E. 663, 665 (1921) (holding that a claim asserting a continuous "discharge" of smoke and water from a railroad facility that damaged adjacent property was governed by a limitation period running from the date of the "construction" of the facility); *White*, 128 Va. at 565, 104 S.E. at 870 (stating that "the statute of limitations begins to run against the cause of action from the time of the complete erection of the nuisance"); *Allen*, 118 Va. at 435, 87 S.E. at 560 (stating that this "general controlling principle" requires that "the statute of limitations begins to run against the cause of action from the time of the complete erection of the nuisance"); *McKinney v. Trustees of Emory & Henry Coll., Inc.*, 117 Va. 763, 767, 86 S.E. 115, 117 (1915) ("[On] the defense of the statute of limitations, we entertain no doubt that under the facts of this case plaintiff's cause of action accrued when the discharge of sewage into Emory creek was in sufficient quantities to pollute the stream and constitute a nuisance."); *Southern Ry. v. McMenamin*, 113 Va. 121, 131, 73 S.E. 980, 983 (1912) (stating that "where a nuisance is permanent" and "will continue indefinitely, there is but a single action therefor, . . . and the right to recover will be barred unless it is brought within the prescribed number of years from the time the cause of action accrued"); *Virginia Hot Springs Co.*, 106 Va. at 473-74, 56 S.E. at 221 (holding that the statute of limitations began to run from construction of a structure "of a permanent character" that caused continuous pollution and barring plaintiff's claim because she failed to bring it "within the time limit of the statute").

*Virginia Hot Springs Co.*, 106 Va. 461, 56 S.E. 216)); Sinclair, *supra*, § 65-4[C], at 65-22

(stating the limitation period begins to run "when the damage originated").[12]

This rule is qualified, however, by an overarching exception that a series of "repeated actions" causing *temporary* injuries to property would run the limitation period anew with each such action. *Virginia Hot Springs Co.*, 106 Va. at 463-64, 56 S.E. at 217-18. This exception can apply even when the physical structure causing the damage is itself a permanent fixture on the offender's property. For example, in *Hampton Roads Sanitation District v. McDonnell*, a sewage plant operating under "normal conditions" did not discharge wastewater on any private property. 234 Va. 235, 237, 360 S.E.2d 841, 842 (1987). When the volume in the sewage plant, however, reached "three times the normal quantity," a discharge occurred through operation of a bypass valve. *Id.*

In *McDonnell*, that abnormal condition occurred on nine separate occasions over a 12-year period with each occasion resulting in a discharge onto the claimant's property. Affirming the trial court, we concluded these "discharges were not continuous" and "occurred only at intervals." *Id.* at 239, 360 S.E.2d at 844. While the sewage plant itself was permanent, the

---

[12] In the case of a "permanent injury," the damages award will "ordinarily" be the diminished value of the property. *Virginia Hot Springs Co.*, 106 Va. at 467-72, 56 S.E. at 219-21 (citation omitted) (collecting cases). Generally, "[b]oth damages and injunction are available as remedies in a common-law action against pollution." Patrick M. McSweeney, *Virginia* § I(B), at 6, *in* 4 Waters and Water Rights pt. XI (Amy K. Kelley ed., 3d ed. 2009). If a court exercises its injunctive powers to enjoin further injury to the property, a compensatory damages award could include the remediation costs of restoring the claimant's property to its former state. *See Packett v. Herbert*, 237 Va. 422, 427, 377 S.E.2d 438, 442-43 (1989) (holding that "if the nuisance can be abated" by an award of injunctive relief, "the adjoining owner is only entitled to such damages as he may have sustained up to the time of the abatement of the nuisance, not including damages for the permanent diminution in the value of his property"); *accord Harrisonville*, 289 U.S. at 337-38 (considering whether "substantial redress" provided by an award of damages for a permanent nuisance counsels against injunctive relief that "would subject the defendant to grossly disproportionate hardship" and would prejudice "an important public interest").

14

discharges were too temporary and episodic to justify the running of a single limitation period. We thus held that "each discharge inflicted a new injury" triggering separate five-year periods of limitation. *Id.*; *see also G.L. Webster Co.*, 172 Va. at 365, 1 S.E.2d at 315 (holding that "the damages were not occasioned by the erection of the factory, or the mere improvement and straightening of the ditches and drains" but rather "by subsequent acts incidental to the operation of the plant"); *Norfolk & W. Ry. v. Allen*, 118 Va. 428, 434, 87 S.E. 558, 560 (1916) ("Diverting the water by the operation of the pump was the cause of the plaintiff's injury" and "was not continuous, but only at intervals, thereby inflicting a new injury with each operation.").

3.

A hundred years ago, we acknowledged that "[t]he authorities are in the main harmonious in stating the general principles" on this subject but that "they are not so in the application of these principles to particular cases." *Allen*, 118 Va. at 434, 87 S.E. at 560. "The confusion which is found in the precedents has arisen not so much from the statement of governing principles as from the inherent difficulty" in applying these principles to the multitude of unique circumstances in which such cases arise. *Id.* at 434-35, 87 S.E. at 560 (citation omitted).

In this case, the parties agree that a cause of action for trespass (if otherwise legally viable)[13] accrued no later than fall 2004 when sediment from the HTC site began to enter Lake Hollymead after the construction of the three sediment basins. That conceded fact serves as the baseline for the main question presented at the plea-in-bar hearing: Were later sediment

---

[13] We offer no opinion on this collective assumption. At common law, trespass typically involved a direct, rather than an indirect, invasion of the possessory rights of the claimant. *See generally* Sinclair, *supra*, § 65-1[B], at 65-7 (noting that although an action for nuisance involves the same type of injury as an action for trespass, nuisances can be distinguished "by the fact that they involve the use of the defendant's own land in a way that interferes unduly with the plaintiff's quiet enjoyment of his land" and implying that a nuisance was a less direct invasion of the claimant's possessory rights than trespass).

15

discharges merely a continuation of the same injury or were they so temporary and episodic as to imply the accrual of *new causes of action* triggering new five-year limitation periods?

Sitting as factfinder, the circuit court received detailed testimony and exhibits on the specific operation of the sediment basins, their physical functions, and their design efficacies. The court also considered whether any of the ongoing sediment discharge could be separated reasonably into discrete episodes. The totality of the evidence convinced the court that the permanent sediment basins discharged into Lake Hollymead on a continuous basis and that the five-year statute of limitations was not revived for any particular discharge episode. Necessarily implicit in the court's findings is its rejection of the POAs' factual claim that this continuous discharge should be treated as factually insignificant.

The court had ample grounds to come to the conclusions that it did. All three of the HTC sediment basins were permanently in place by fall 2004. The structural features of the basins automatically controlled their day-to-day operations. No HTC defendant exercised any operational control over the basins or modified them in any way. Nor were any bypass valves turned on or off on specific occasions over the years. The witnesses, including the POAs' own expert, recognized that sediment discharge, at least to some degree, continuously flowed from the basins into Lake Hollymead because of the functional design of the basins.[14] Absent "any cause but human labor," *Virginia Hot Springs Co.*, 106 Va. at 464-65, 56 S.E. at 218 (citations omitted), sediment discharge from the HTC basins will likely continue indefinitely. No evidence persuaded the trial court that the continuity of this sediment flow was punctuated by stand-alone,

---

[14] We thus need not address *Richmond Fairfield Ry.*, 156 Va. at 286-87, 157 S.E. at 818 (holding that claimant's injury from sewer discharge on her property was not "permanent" when the defendant planned to "discontinue" the discharge).

temporary episodes of discharge that were materially different from the continuous sediment discharges that began as early as 2004.

The POAs' argument to the contrary appears to rest on the assumption that it matters, for accrual purposes, that the continuing nature of the damage might fluctuate or even get worse over time. Under Virginia law, however, the limitation period "will *not* be extended simply because the damage is much larger in later years than it was when the structures were first erected." Sinclair, *supra*, § 65-4[C], at 65-21 (emphasis in original). We made this point in *Southern Railway v. McMenamin*, 113 Va. 121, 73 S.E. 980 (1912), in which this Court rejected the assertion that "the bar of the statute of limitations" could only be applied to ongoing injuries that were "continuous in the same manner, and substantially to the same extent," from their inception. *Id*. at 132, 73 S.E. at 983 (emphasis omitted). A showing of "increased damage," by itself, does not defeat the application of the statute of limitations in this context. *Id*. Thus, it is "not essential to the defense of the statute of limitations that the damage complained of should exist to the same extent during the period of five years." *Id*. (emphasis and citation omitted).[15]

### C. DENIAL OF THE POAS' MOTION FOR SUMMARY JUDGMENT

The POAs' second assignment of error asserts that the circuit court erred by "refusing to rule" on their motion for summary judgment, which asserted that Virginia courts should adopt

---

[15] *See also Ellerson Floral Co. v. Chesapeake & Ohio Ry.*, 149 Va. 809, 812, 141 S.E. 834, 835 (1928) (expressing "no quarrel" with prior cases "which hold that obstructions which, with certainty, will cause floods, although at uncertain intervals, constitute permanent nuisances"); *White*, 128 Va. at 568, 104 S.E. at 871 ("There can be no question that this is a permanent structure, and that the evidence warrants the conclusion, that the injuries to the land flowing from it are not of a recurrent or intermittent character, but are permanent in their nature, and in the normal course of things will continue indefinitely. It is true that the water sometimes gets low in dry weather, and the overflow ceases temporarily, but the menace of an overflow and destruction of crops is always present, as shown by the repeated damage to crops." (emphasis omitted) (quoting *Etheridge*, 120 Va. at 381, 91 S.E. at 134)).

the approach of the Restatement (Second) of Torts to their claim concerning the "continuing nature of damage" caused by the "unremoved deposits of silt and sediment." Appellants' Br. at 8. If we embrace this approach, the POAs reason, "the applicable statute of limitations should run continuously until such time as the trespassing materials are physically removed" from Lake Hollymead, and thus, they should be allowed a "recovery of damages" based upon common-law trespass "for the entire period of trespassing events." *Id.* at 18. Under the POAs' understanding of the Restatement approach, a statute of limitations for a trespass claim seeking damages begins to run only when the continuing trespass ceases. In this case, they conclude, the five-year limitation period in Code § 8.01-243(B) "should not begin until such deposits stop." *Id.* at 24.

We find this argument tangled with several conceptual knots. To begin, the circuit court did not refuse to rule on the POAs' motion for summary judgment. That motion was never scheduled for a hearing, and thus, the court understandably addressed the only issue before it, which was limited to the HTC defendants' pleas in bar. This fact alone ordinarily would be sufficient for us to decline to address the arguments asserted in the motion for summary judgment. *See* Rule 5:25; *Scialdone v. Commonwealth*, 279 Va. 422, 437, 689 S.E.2d 716, 724 (2010) (finding that there is "no basis for review or action by this Court on appeal" for purposes of Rule 5:25 if "there is no ruling by the trial court on the issue" (quoting *Riverside Hosp., Inc. v. Johnson*, 272 Va. 518, 526, 636 S.E.2d 416, 420 (2006))). In this case, however, the POAs asserted the underlying argument during the plea-in-bar hearing while simultaneously acknowledging that they understood their motion for summary judgment was not yet before the court for a ruling. *See* J.A. at 591. We thus address the legal issue only in that context.

So viewed, the POAs' continuing-trespass argument misses the point of the circuit court's ruling. Whether a common-law tort has occurred and, if so, how long it lasts, is not the

18

same thing as when, if ever, a statute of limitations bars the assertion of that tort claim in court. A dismissal based on a statute-of-limitations defense presupposes, at least arguendo, that an otherwise viable cause of action exists. And on this issue, the Restatement merely repeats an incontestable general proposition:

> An unprivileged remaining on land in another's possession is a continuing trespass for the entire time during which the actor wrongfully remains. Such a continuing trespass is to be distinguished from a series of separate trespasses on land, as where A habitually crosses B's field without a privilege to do so.

Restatement (Second) of Torts § 158 cmt. m (1965). That is a fair restatement of English common law,[16] which is the law of this Commonwealth already, *see* Code § 1-200, and has been received as such as part of our common-law heritage, *see, e.g.*, *Fancher v. Fagella*, 274 Va. 549, 556, 650 S.E.2d 519, 522-23 (2007) (finding that the pleaded facts of encroaching tree roots causing damage to a neighbor's property "if proved . . . would constitute a continuing trespass"); *Xspedius Mgmt. Co. of Va. v. Stephan*, 269 Va. 421, 423-24, 611 S.E.2d 385, 386 (2005) (finding a continuous trespass when an underground fiber optic line remained on another's property without permission).

Even so, the five-year statute of limitations, of course, is a statute — not a principle of common-law trespass. "There was no such thing," after all, "as a limitation of actions at

---

[16] *See generally* 5 Matthew Bacon, A New Abridgment of the Law 192 (1766) (stating that declaring an "Action of Trespass Vi et Armis with a Continuando" is appropriate "where the Trespass may have been continued without Intermission for a longer Time than the Space of one Day" as opposed to distinct actions brought "because as the Whole of such Trespass must have been committed upon one Day, it cannot have been either continued to or repeated upon any other" (emphases omitted and archaic spelling modified)); 3 William Blackstone, Commentaries *212 ("In trespasses of a permanent nature, where the injury is continually renewed, (as by spoiling or consuming the herbage with the defendant's cattle,) the declaration may allege the injury to have been committed by continuation from one given day to another, (which is called laying the action with a continuando,) and the plaintiff shall not be compelled to bring separate actions for every day's separate offence." (emphases omitted)).

common law." *Johnson v. Merritt*, 125 Va. 162, 175, 99 S.E. 785, 789 (1919); *see also*

*Quackenbush v. Isley*, 154 Va. 407, 413, 153 S.E. 818, 820 (1930); Burks, *supra*, §§ 230-31, at

390-91. The question we must answer in this case is how Code § 8.01-243(B), the five-year

statute of limitations applicable to property injuries, applies to the specific facts of this case. Our

earlier discussion has already answered that question. Based on the circuit court's factfinding,

Code § 8.01-243(B) began the five-year limitation period applicable to property-damage claims[17]

when the HTC defendants' permanent sediment basins first began its continuous discharging of

sediment into Lake Hollymead. *Supra* at 15-17.

    The Restatement provisions relied upon by the POAs do not specifically address the

application of statutes of limitations to continuous injuries to property either under trespass or

nuisance law. The most the Restatement says on the subject is that the continuing-trespass rule

"may be of importance where an action for the original entry is barred by the statute of

---

[17] "In a proper case an injunction will be granted to compel the actor to remove from the land a structure, chattel or other thing wrongfully placed there by him." Restatement (Second) Torts § 161 cmt. b (1965) (Reporter's Notes). "Permanent encroachments may also provide a basis for mandatory injunctions. Nevertheless, even though an award of damages may not be adequate to remedy an encroachment, issuance of an injunction to remove the encroachment remains discretionary with the court." 9 Richard R. Powell, Powell on Real Property § 64A.05[8], at 64A-61 to -62 (Michael Allan Wolf ed., 2016).

    The POAs, however, limited their argument on appeal to their claim for trespass damages. They do not address equitable remedies, such as injunctive relief, the doctrine of laches, Code § 8.01-230 (recognizing the "solely equitable" exception for accrual), or the doctrine that equity follows the law. *See* Sinclair, *supra*, § 43-2[E], at 43-13; *id.* § 51-4[F], at 51-36; *id.* § 65-4[A], at 65-19 n.1; *cf. E.W. Face & Son v. Cherry*, 117 Va. 41, 45, 84 S.E. 10, 11 (1915) (refusing to apply laches to a "continuing nuisance" based upon "gradual and cumulative" conditions creating the nuisance). As the Restatement has observed, "[a] potent cause of confusion as to the meaning and scope of private nuisance lies in the failure to distinguish the action at law from the suit for injunction in equity." Restatement (Second) of Torts § 822 cmt. d (1979). We nevertheless offer no opinion on these subjects given the limited scope of the POAs' assignments of error.

limitations, or where successive actions are brought for a continuing trespass." Restatement (Second) of Torts § 160 cmt. h (1965); *see also id.* § 899 cmt. d (1979); *id.* § 930(1)-(2).

We acknowledge that, from these oblique references, some courts have inferred the POAs' conclusion that, if a trespass or nuisance were continuous, no limitation period should ever run until the continuing trespass or nuisance ceases altogether. *See* Appellants' Br. at 26-28 (citing *Hoery v. United States*, 64 P.3d 214, 217-19 (Colo. 2003)). Our view to the contrary, however, has been the law of this Commonwealth for over a century. We are confident that the General Assembly by now would have corrected any misinterpretation of the statute of limitations on our part if, indeed, there were one. *See generally Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 428, 732 S.E.2d 690, 702 (2012). Though we accept the admonition that "[the] verdict of quiescent years cannot be invoked to baptize a statutory gloss that is otherwise impermissible," *Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969), the POAs have not persuaded us that our traditional view on this subject should be set aside.

### III.

Addressing only the two assignments of error before us, we hold that the circuit court correctly applied the statute of limitations to the POAs' claim of trespass damages and did not erroneously deny the POAs' motion for summary judgment.

*Affirmed.*