COURT OF APPEALS OF VIRGINIA

Present:    Judges Huff, AtLee and Malveaux
Argued by videoconference

**UNPUBLISHED**

TAMMY ANNE REINBOLD

MEMORANDUM OPINION[*] BY
JUDGE GLEN A. HUFF
SEPTEMBER 21, 2021

v.        Record No.  0093-21-1

CITY OF NEWPORT NEWS
  DEPARTMENT OF HUMAN SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Bryant L. Sugg, Judge

Charles E. Haden for appellant.

Patrick C. Murphrey, Assistant City Attorney II (E. Paul Hubert,
Guardian *ad litem* for the minor children, on brief), for appellee.

In this appeal, Tammy Anne Reinbold ("appellant") challenges the Newport News

Circuit Court's (the "trial court") decision to terminate her residual parental rights.  To that end,

she contends the evidence was insufficient to show that termination was in the best interests of

the children or to show that she was unable or unwilling to substantially remedy the

circumstances that led to her children's initial placement in foster care.  Because the trial court's

decision was based on factual findings that were not plainly wrong or without evidence to

support them, this Court affirms.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND

Because the City of Newport News Department of Human Services (the "Department") was the prevailing party below, this Court views the evidence in the light most favorable to it. Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018). Viewed through this lens, the evidence shows the following:

Appellant had four children: G.S., born December 12, 2001; I.S., born April 2, 2003; J.S., born January 17, 2008; and S.R., born November 17, 2012.[1] On May 30, 2017, the children were placed in foster care due to appellant's inability to provide stable housing as well as her unwillingness to be around or provide for G.S. or I.S., given those children's strained relationship with appellant's partner, Marshall Martin.

On April 11, 2018, the Department filed petitions in the Newport News Juvenile and Domestic Relations District Court (the "JDR court") to terminate appellant's residual parental rights for all the children pursuant to Code § 16.1-283. On January 29, 2019, the JDR court granted the Department's petitions and terminated appellant's residual parental rights. On February 6, 2019, appellant appealed the JDR court's termination orders to the trial court, for which a *de novo* hearing took place on August 25, 2020.

At the hearing, the Department elicited testimony from three witnesses. The first witness was Dr. Tuesday Tauchen Smith, a clinical psychologist who conducted a parental capacity evaluation of appellant in May of 2017. In that evaluation, Dr. Smith discovered that appellant suffered from bipolar disorder and had an IQ of 68, both of which contributed to a concern that

---

[1] This opinion uses abbreviations for the children's names to protect their privacy. Additionally, the record in this case was sealed. To properly address the assignment of error appellant raises, this opinion includes portions of the sealed record. See Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017) ("To the extent that this [Court] mentions facts found in the sealed record, [it] unseal[s] only those specific facts, finding them relevant to the decision in th[e] case.").

appellant "may lack some of the basic skills necessary for effective parenting." Specifically, Dr. Smith was concerned that appellant's low cognitive functioning would raise the risk of "parentification," a phenomenon where children rely more on themselves than their parent for direction and basic needs. Given those concerns, Dr. Smith opined that appellant "most likely require[d] a significant amount of guidance and assistance in providing appropriate care and discipline for her children." Consequently, Dr. Smith recommended that appellant receive psychiatric and medicinal treatment for her bipolar disorder and that she attend parenting classes.

On cross-examination, Dr. Smith relayed that, to her knowledge, appellant had been going to Dr. Michael Murphy for medication management services relating to her bipolar disorder. Furthermore, when asked whether appellant could still properly parent her children despite her low IQ and bipolar disorder, Dr. Smith responded in the affirmative. However, Dr. Smith clarified that in order for appellant to do so, "some skill building" and parenting classes would be needed.

The Department's second witness was one of its Senior Family Engagement Specialists, Toni Montgomery. Starting in early June of 2017, Montgomery's role was to "work on reunification services" with appellant and her children, "identify services" that appellant needed to remedy the circumstances that led to the children's initial placement in foster care, and "explore . . . placement options that may be viable for the children."

Montgomery testified that following the children's placement into foster care, the ultimate goal of her work with appellant was to have the children "return home" with appellant with the concurrent goal of placement with relatives. The "only identified relatives" to Montgomery's knowledge were a family known as "the Browns," who were "fictive kin" to appellant. Montgomery noted that because the two older children had a strained relationship with Martin, they had for the most part been living with the Browns since at least June of 2017.

When asked what barriers existed to appellant's ability to have the children return to her care, Montgomery responded that it was appellant's lack of an ability to maintain stable and consistent housing, the older children's poor relationship with Martin, and appellant's "limited resources in terms of finances." To address the financial aspect of those barriers, Montgomery "engaged [appellant] in employment assistance," where she would send appellant "correspondence via email for her to engage with various employers that would work with her." Montgomery also referred appellant to Goodwill's employment center, which had an "employment case manager" who would provide appellant with "one-on-one training" and assist her in any employment search. Furthermore, Montgomery had appellant meet with a case manager from the Department's housing broker team who would assist appellant in taking steps to find adequate housing for appellant and her children so long as appellant and Martin produced documentation of their income in the process.

Montgomery testified that appellant had consistent trouble keeping up with the tasks to improve her financial situation. Specifically, she noted that appellant never took advantage of the resources offered to her through Goodwill's employment center and generally failed to maintain gainful employment since the children were placed in foster care. Although appellant did obtain employment with Chick-fil-A in January of 2018, that employment was "short lived," as appellant was terminated the very next month "due to her behavior on the job." Montgomery stated that although appellant claimed to do housekeeping jobs for Martin's mother from time to time and further claimed to work for "a resort in Williamsburg," neither appellant nor Martin provided her with any proof of income that substantiated appellant's claims. And when Montgomery asked to see appellant's bank account to verify her financial circumstances,

Montgomery observed that appellant had a negative bank statement and that there had been no deposits to appellant's account for "several months."[2]

Montgomery also observed that appellant struggled to follow through with obtaining mental health services. Specifically, she noted that appellant's individual therapy with Dr. Murphy had "lapsed" because appellant had missed several appointments. Furthermore, Montgomery testified that appellant had attended Mental Health Skill Builders to help with her bipolar disorder, but that appellant's enrollment was initially terminated in April of 2018 "due to her noncompliance with services and lack of progression" in the program. Appellant was, however, able to receive mental health services with an organization called One Life Once starting in December of 2018.

With respect to appellant's housing situation, Montgomery testified that although appellant had been primarily staying in a hotel room with Martin since the time the children were placed in foster care, appellant and Martin did start renting a house in Newport News on May 5, 2018. The house was obtained independently by appellant and Martin and not through the Department's housing broker services.

Appellant and Martin's rental house had three bedrooms. One bedroom had a bed that was occupied by J.S. Another was occupied by S.R. but did not have a bed; instead, S.R. slept in a tent set up in that room. The other bedroom was occupied by appellant and Martin. There was no room for either of the two older children, which may have been appellant's intention given that, according to Montgomery, appellant "did not want" those children in the home. Moreover, appellant and Martin were not keeping up with their rent payments. Instead, in order to stay at the home, they primarily relied on the good graces of the landlord, who was showing them lenience even though they were falling behind on rental payments.

---

[2] The record does not reflect when this particular interaction took place.

On cross-examination, Montgomery acknowledged that some positive developments had occurred with appellant since the children were placed in foster care. For example, she noted that appellant had participated in and nearly completed five parenting classes. She also acknowledged that appellant had been participating in structural family therapy for the primary purpose of "building a relationship or try[ing] to rebuild a relationship between [her] and [the] older two children."

The Department's third witness was Latisha Ford, one of the Department's Family Service Specialists. Ford's primary role in appellant's case was to oversee the children's foster care placement and to ensure that "case management services" were provided to the children. Ford also oversaw many supervised visits between appellant, J.S., and S.R. In those visits, Ford noticed that S.R. had a hyperactive personality and that, in response, J.S. took on a parentified role over S.R. where she would "boss him around" and "try to implement rules and things" for him. When appellant tried to intervene and resolve any conflict between those two children, both J.S. and S.R. would "not really listen." This would cause appellant to become "frustrated," "withdrawn," and "overwhelm[ed]." These visits between appellant, Ford, and the two younger children remained "supervised," as appellant never got to the stage where she could be left with the children unsupervised.

Ford also testified that each of appellant's children was receiving various kinds of services. G.S. received "medication management" treatment for general restlessness and attended "Christian Psychotherapy in Virginia Beach." I.S. had previously attended "individual therapy[,]" but Ford did not specify what type of therapy that was. J.S., like G.S., received medication therapy and "Christian Psychotherapy." S.R. received "individual therapy, medication management, [and] ADA therapy," the latter of which was designed to address his autism, which he was diagnosed for in February of 2019.

Finally, Ford testified as to each child's current living situation as of the time of trial. She noted that G.S. was living with his girlfriend and her family in Portsmouth. She stated that I.S. was placed with a family in Newport News, J.S. with a family in Hampton, and S.R. with a family in Virginia Beach.

Appellant called her partner, Martin, as a witness. He testified that he worked in the construction business and that his boss was also his and appellant's landlord. He claimed that while he was responsible for the utility bills associated with the rental home, both he and appellant "pool[ed]" their income to pay for the rent under the lease. When asked why he never provided proof of his income when requested by Montgomery, he stated that he was working for GEICO on a temporary basis at the time Montgomery made those requests and that GEICO would not give him proof of income documentation when he asked them for it.

Martin maintained that appellant had consistently and successfully received mental health skill building services and psychiatric therapy. He further concluded that, from his observations of appellant engaging with the children, she was a fit parent and that her cognitive issues and bipolar disorder would not serve as a barrier to her parenting.

Appellant also testified on her own behalf. She stated that although she had not been gainfully employed for several years, she was receiving Social Security income in the amount of $803 per month. She also claimed that her and Martin's rental home was sufficient to house I.S., J.S., and S.R. if the court were to transfer those children back to her custody, although she acknowledged that I.S. "d[id] not want to come home" and live with her at that time.

At the close of the evidence, the Department requested that the trial court terminate appellant's residual parental rights. Specifically, it alleged that termination was in the children's best interests and that appellant had not substantially remedied the circumstances that led to the children's placement in foster care. The children's guardian *ad litem* also voiced support for the

termination of appellant's parental rights, relying in principal on Dr. Smith's concerns that appellant's cognitive limitations and bipolar disorder would serve as likely barriers to her being able to parent the children, particularly when the children themselves had their own mental health issues.

In response, appellant's trial counsel stated that although appellant had some issues with following through on all her financial and mental health obligations, she had "tried" to follow through on those obligations and that there was abundant evidence that she cared for and loved her children. Accordingly, appellant requested that the trial court not terminate her residual parental rights.

After closing arguments, the trial court found that the Department met its burden to prove that termination of appellant's residual parental rights was in the best interests of the children and that appellant had not substantially remedied the circumstances that led to placing the children in foster care. Consequently, the trial court terminated appellant's residual parental rights, and on January 29, 2021, it entered written orders memorializing its rulings for each child.

This appeal followed.

## II. STANDARD OF REVIEW

Appellant challenges the sufficiency of the Department's evidence to prove that termination of her parental rights was in the children's best interests and that she was unable to remedy the circumstances that led to placing the children in foster care. When reviewing factual challenges like this one, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Castillo v. Loudoun Cnty. Dep't of Fam. Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cnty. Dep't of Hum. Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the [trial] court hears the evidence *ore tenus*, its finding[s] [are] entitled to great weight and

will not be disturbed on appeal unless plainly wrong or without evidence to support [them]." Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)); see also Ferguson v. Stafford Cnty. Dep't of Soc. Servs., 14 Va. App. 333, 336 (1992) ("Where the record contains credible evidence in support of the findings made by [the trial] court, we may not retry the facts or substitute our view of the facts for those of the trial court.").

## III.  ANALYSIS

Appellant argues the Department failed to prove by clear and convincing evidence that termination of her residual parental rights was warranted under Code § 16.1-283(C)(2).  Because the trial court's conclusion to the contrary was not plainly wrong or without evidence to support it, this Court disagrees.[3]

Before resolving that issue, this Court first addresses an additional argument appellant makes with respect to the trial court's termination of appellant's parental rights over G.S.  When appellant appealed from the JDR court's termination orders, G.S. was seventeen years old.  But at the time of the termination hearing and when the trial court issued its termination orders, G.S. was eighteen years old.  At that point, appellant avers, it was "doubtful" whether Code

---

[3] The Department charges that appellant's assignment of error is waived under Rule 5A:18.  It relies on the fact that appellant never moved to strike the Department's evidence at trial and never specifically argued in closing that the Department failed to meet its burden of proving the elements of Code § 16.1-283(C)(2) by clear and convincing evidence. Notwithstanding those points, appellant's counsel made clear in closing argument that appellant opposed termination of her parental rights, and the trial court analyzed the precise issues of fact and statutory law relevant to this appeal.  Therefore, this Court assumes without deciding that appellant's assignment of error was sufficiently preserved for this Court's consideration.  See Moncrief v. Div. of Child Support Enf't ex rel. Joyner, 60 Va. App. 721, 729 (2012) ("In interpreting Rule 5A:18, the Supreme Court has . . . held that if a trial court is aware of a litigant's legal position and the litigant did not expressly waive such arguments, the arguments remain preserved for appeal.'" (quoting Brown v. Commonwealth, 279 Va. 210, 217 (2010))); see also Weiford v. City of Hampton Dep't of Soc. Servs., No. 0311-18-1, slip op. at 6-7 (Va. Ct. App. Mar. 5, 2019) (assuming without deciding that challenge to sufficiency of the evidence to support termination of parental rights was preserved).

- 9 -

§ 16.1-283 granted the trial court jurisdiction to terminate her parental rights with respect to G.S., given that G.S. was no longer a "child."

But that argument alleges a defect in the trial court's active jurisdiction,[4] which means appellant was required to raise it in the trial court to preserve it for appellate review. Porter v. Commonwealth, 276 Va. 203, 228-29 (2008) ("In contrast [to defects in potential jurisdiction], defects in the other jurisdictional elements generally will be considered waived unless raised in the pleadings filed with the trial court and properly preserved on appeal." (quoting Morrison v. Bestler, 239 Va. 166, 170 (1990))). A court obtains "active" jurisdiction—or the "power" to proceed to the merits of cases it has potential jurisdiction over—only when certain additional elements are present. Whitt v. Commonwealth, 61 Va. App. 637, 649-50 (2013); see also Ghameshlouy v. Commonwealth, 279 Va. 379, 389-90 (2010) ("'[P]otential' jurisdiction . . . is the authority granted to [a court] by constitution or statute over a specified class of cases or controversies, and becomes 'active' jurisdiction, the power to adjudicate a particular case upon the merits, only when various elements are present."). Specifically, a court's "potential" jurisdiction ripens into "active" jurisdiction when the court has: (1) territorial jurisdiction; (2) personal jurisdiction; and (3) any other "conditions of fact . . . which are demanded by the unwritten or statut[ory] law as the prerequisites of the authority of the court to proceed to

---

[4] Appellant's argument cannot be understood to allege a defect in the trial court's potential jurisdiction. Potential jurisdiction equates to subject matter jurisdiction, or the "authority vested in a court by constitution or statute to adjudicate certain categories of disputes." Smith v. Commonwealth, 281 Va. 464, 467 (2011); see also Whitt v. Commonwealth, 61 Va. App. 637, 649 (2013). Any action taken by a court without potential jurisdiction "can be [challenged] at any time in the proceedings, even for the first time on appeal by the court *sua sponte*." Porter v. Commonwealth, 276 Va. 203, 228 (2008) (quoting Morrison v. Bestler, 239 Va. 166, 170 (1990)). There is no question that the trial court had potential jurisdiction over this case, as the resolution of parental rights is a "class" or "category" of cases that statutory law gives JDR courts—and by extension circuit courts—the authority to adjudicate. See generally Code § 16.1-241.

judgment or decree." Morrison, 239 Va. at 169 (quoting Farant Invest. Corp. v. Francis, 138 Va. 417, 427-28 (1924)).

Appellant's argument, in essence, charges that the trial court did not have active jurisdiction to proceed to the merits with respect to her parental rights of G.S. because statutory law demands, as a "condition of fact," that the "child" at issue be a person under the age of eighteen. See Code § 16.1-228(7) (defining "adult" as a "person 18 years of age or older" and a "child" as a person "younger than 18 years of age"); Code § 16.1-283 (repeatedly referencing the termination of residual parental rights of a "child"). But appellant did not raise this argument in the trial court (nor did she include it within her assignment of error). This Court therefore does not consider it on appeal. Rule 5A:18; see also Banks v. Commonwealth, 67 Va. App. 273, 289-90 (2017) ("This Court is limited to reviewing the assignment of error presented by the litigant . . . [and] do[es] not consider issues touched upon by the appellant's argument but not encompassed by h[er] assignment of error."); Forest Lakes Cmty. Ass'n., Inc. v. United Land Corp. of Am., 293 Va. 113, 123 (2017) ("Like a well-crafted pleading, assignments of error set analytical boundaries for arguments on appeal, provide a contextual backdrop for [this Court's] ultimate ruling, and demark the stare decisis border between holdings and dicta.").

Turning now to the issues that are properly preserved, this Court first refers to Code § 16.1-283(C)(2). To prove that termination of a parent's residual parental rights is appropriate under that statute, the Department must show, by clear and convincing evidence, that (1) termination is in a child's best interests and (2) the parent, without good cause, has been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. See Code § 16.1-283(C)(2).

Beginning first with the second requirement, this Court holds that the trial court's conclusion that appellant, without good cause, proved unable to substantially remedy the circumstances that led to the children's placement in foster care was not plainly wrong or without evidence to support it. The initial reasons for the children's placement in foster care were that appellant cut off her relationship with the older two children and had shown herself unable to provide stable housing for all the children. To the former reason, there was no evidence in the record that appellant made any progress to amend or improve her relationship with the older children. In fact, Montgomery testified that even at the end of the process, appellant "did not want" the two older children to move back in with her, and appellant herself admitted in her testimony that I.S. had no desire to move back in with her and Martin.

To the latter reason, appellant did not own or rent a home for approximately one year from the time the children were placed in foster care. Although she and Martin did begin renting a house on May 5, 2018, evidence in the record shows that housing arrangement was inadequate and unstable. For one thing, the house only had enough bedrooms to house two of the four children.[5] For another, Montgomery testified that appellant and Martin were behind on rental payments and that the only reason they had not been evicted was due to the good graces of the landlord. The trial court was entitled to infer that such an arrangement would not go on in perpetuity, especially when considering that appellant had a negative bank account balance and failed to maintain gainful employment from the time the children were placed in foster care.

Moreover, it is not as though appellant's inability to make the necessary changes came as a result of the Department's failure to provide her reasonable and appropriate services. The Department referred appellant to both parenting classes and structural family therapy.

---

[5] While this Court cites the rental home's small number of bedrooms in its analysis, it only does so in light of the highly deferential standard of review on factual questions.

Montgomery testified that she had appellant working with the Department's housing broker team to assist appellant in finding adequate housing for the children, but appellant went her own way and leased a home independent of the housing broker team's services. Montgomery also testified that, to help appellant improve her financial situation, she provided appellant employment assistance and referred her to Goodwill's employment services, the latter of which she failed to use. Finally, the Department incentivized appellant to show proof of any improvement in her financial situation when it required her and Martin to provide income documentation, which neither of them did. Therefore, the evidence was sufficient for the trial court to conclude that appellant not only failed to make the requisite changes to remedy the circumstances that led to the children's placement in foster care without good cause, but also that the Department provided reasonable and appropriate assistance on behalf of appellant's efforts. See Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005) ("[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes.").

The trial court's finding that termination was in the children's best interests is also not plainly wrong or without evidence to support it. Such is self-evident with respect to the two older children, from whom appellant distanced herself prior to all the children's placement in foster care, and she has not repaired her relationship with them since. As mentioned, Montgomery testified that appellant to this day has expressed that she does not want either of the older children living with her given those children's strained relationship with Martin.

Regarding the best interests of the younger two children, two factors taken together cast significant doubts on appellant's ability to successfully parent them: (1) her unstable financial and housing situation and (2) her mental health circumstances. To the former, the trial court

rationally could have concluded that because appellant was mostly unemployed since the children were placed in foster care, showed a negative bank account balance when looked into by Montgomery, and was relying on the good graces of her and Martin's landlord to avoid eviction, she was highly likely to be incapable of providing the younger children with stable housing for the indefinite future. Appellant had ample time to prove that she could stabilize her financial and housing situation but failed to do so. Neither the trial court nor the children need to have waited indefinitely for appellant to have achieved that stability. See Tackett v. Arlington Cnty. Dep't of Hum. Servs., 62 Va. App. 296, 322 (2013) ("It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." (quoting Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990))); see also Lecky v. Reed, 20 Va. App. 306, 312 (1995) ("[F]urther delay would prolong [the children's] familial instability without the promise of benefit to [them], a result clearly contrary to the child[ren's] best interests.").

To appellant's mental health circumstances, Dr. Smith testified that appellant had bipolar disorder and generally suffered from low cognitive functioning. Although such presumably would not serve as an insurmountable affront to appellant's ability to successfully parent the younger two children, Dr. Smith did testify that appellant's current mental health situation was a barrier, nonetheless. The trial court rationally could have been concerned with appellant's mental health situation, particularly when considering that both J.S. and S.R. themselves had mental health issues—J.S. required medication management and psychotherapy, and S.R. required special treatment and therapy given his autism diagnosis.

The trial court also rationally could have had its concerns amplified when it heard Ford's testimony on appellant's supervised visitation with the two younger children. Specifically, Ford testified that J.S. took on a "parentified" role over S.R., which created conflict between those two

children. When appellant tried to take control of the situation, neither J.S. nor S.R. listened to appellant, which caused appellant to become overwhelmed and withdrawn. Although only an account of one particular incident, the trial court had to view that incident in the context of appellant's overall mental health circumstances, as well as the fact that appellant never "graduated" from supervised visitation to unsupervised visitation. As was true with appellant's financial situation, the trial court rationally could have found that prolonged waiting for appellant's mental health situation to improve to the point where she could successfully parent the younger children was not in those children's best interests. See Richmond Dep't of Soc. Servs. v. L.P., 35 Va. App. 573, 585 (2001) (noting parent's mental "deficiency" served to "prolong[] the lack of stability and permanency in [a child's] life").

In short, the trial court's factual determination that the Department met its burden to prove that termination of appellant's residual parental rights was warranted under Code § 16.1-283(C)(2) was not plainly wrong or without evidence to support it. Therefore, this Court leaves the trial court's judgment undisturbed.

## IV. CONCLUSION

For the foregoing reasons, this Court affirms the trial court's decision to terminate appellant's residual parental rights.

Affirmed.